# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR TELEPHONE TOWERS PROVIDING SERVICE TO 310 FIRST STREET, SE, WASHINGTON, D.C., 430 SOUTH CAPITOL STREET, SE #3, WASHINGTON, D.C., AND THE VICINITY BETWEEN THEM ON JANUARY 5, 2021 THAT IS STORED AT PREMISES CONTROLLED BY VERIZON WIRELESS<br><br>IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR TELEPHONE TOWERS PROVIDING SERVICE TO 310 FIRST STREET, SE, WASHINGTON, D.C., 430 SOUTH CAPITOL STREET, SE #3, WASHINGTON, D.C., AND THE VICINITY BETWEEN THEM ON JANUARY 5, 2021 THAT IS STORED AT PREMISES CONTROLLED BY AT&T CORPORATION<br><br>IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR TELEPHONE TOWERS PROVIDING SERVICE TO 310 FIRST STREET, SE, WASHINGTON, D.C., 430 SOUTH CAPITOL STREET, SE #3, WASHINGTON, D.C., AND THE VICINITY BETWEEN THEM ON JANUARY 5, 2021 THAT IS STORED AT PREMISES CONTROLLED BY SPRINT CORPORATION<br><br>IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR TELEPHONE TOWERS PROVIDING SERVICE TO 310 FIRST STREET, SE, WASHINGTON, D.C., 430 SOUTH CAPITOL STREET, SE #3, WASHINGTON, D.C., AND THE | **Nos. 21-sc-59, 21-sc-60, 21-sc-61, 21-sc-62 (GMH)** |

| |
|---|
| VICINITY BETWEEN THEM ON JANUARY 5, 2021 THAT IS STORED AT PREMISES CONTROLLED BY T-MOBILE, US |

## ORDER

Before the Court is the government's latest request, filed on January 13, 2021, for a search warrant to seize information from cellular telephone towers that serve an area of interest related to an ongoing criminal investigation.[1] The version now before the Court is the second of two versions provided to the Court for review.[2] *See* ECF No. 1 ("1/12/2021 Request"); ECF No. 3 ("1/13/2021 Request"). The government requests a cell tower dump, which is a data dump of all cellphones serviced by a particular cell-tower or towers over a specified time frame. As courts have recognized, "[a]ny order authorizing a cell tower dump is likely to affect at least hundreds of individuals' privacy interest." *In re Search of Cellular Telephone Towers*, 945 F. Supp. 2d 769, 770 (S.D. Tex. 2013). The cell tower dump requested here, if authorized, would provide the government with access to hundreds, if not thousands, of cellphone identifiers of individuals who are indisputably innocent of the criminal activity under investigation and who would be of no evidentiary value to the government. Further, as disclosed in the government's 1/12/2021 Request, the government can, using the information provided from the cell tower dump, track the location

---

[1] The government filed four applications, one for each major cellular service provider—Verizon, AT&T, T-Mobile, and Sprint. *See* Case Nos. 21-sc-59, 21-sc-60, 21-sc-61, 21-sc-62. These four applications are materially similar, so this Order will cite to only the AT&T applications in Case No. 21-sc-60.

[2] The government filed the earlier version in Case Nos. 21-sc-60 and 21-sc-61, and sent unfiled copies to the undersigned's chambers for Case Nos. 21-sc-59 or 21-sc-62; however, as with the 1/13/2021 Requests, all four 1/12/2021 Requests were materially similar, so this Order will cite only the 1/12/2021 AT&T Request from Case No. 21-sc-60.

of any of the cell phone identifiers with an accuracy that approaches that of a global positioning system ("GPS").[3]

There is precious little caselaw providing guidance as to the appropriate legal standard and protections that should apply to a cell tower dump request. *See e.g. Carpenter v. United States*, __ U.S. __, __ , 138 S. Ct. 2206, 2220 (2018) (finding request for individual's historic cell-site records constituted request for a search but declining to "express a view on … 'tower dumps'"). Nevertheless, the government here is seeking a cell tower dump through a search warrant, so that is the standard the Court must apply. Authorization of a search warrant requires the government to establish probable cause and "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV; *see In re Matter of Search of Info. Associated with Facebook Acct.*, 21 F. Supp. 3d 1, 6 (D.D.C. 2013) ("[I]t is this Court's duty to reject any applications for search warrants where the strict standard of probable cause has not been met."). To find probable cause, a reviewing court must determine that "there is a *fair probability* that contraband or evidence of a crime would be found in a particular place." *United States v. James*, No. 18-cr-216, 2018 WL 6566000, at *3 (D. Minn. Nov. 26, 2018). For the reasons stated below—chief among them that the government's cell tower dump application fails to show there is a fair probability that the requested data will provide evidence in this matter—the warrant is denied.

## **BACKGROUND**

The underlying investigation involves evidence recovered from two points, which are connected by approximately two city blocks. ECF No. 3 at 13. There is also evidence showing an unidentified subject ("the suspect") at each of the two points and walking between those points.

---

[3] The government has omitted this language from the version now before the Court. *Compare* ECF No. 1 at 23-24 (discussing triangulation), *with* ECF No. 3 (no discussion of triangulation).

*Id.* at 16–17. To identify the suspect, the government has applied for a search warrant for cell tower data in the vicinity of the two points and the area that connects them. ECF No. 3 at 5. This type of search warrant is referred to as a cell tower dump because it seeks all cellular telephone data, within certain temporal and geographic parameters defined by the government, from area cell towers. Cell tower dumps have been permitted by some courts where multiple crimes are committed either at different locations or at the same location, but on different days. *See e.g.*, *James*, 2018 WL 6566000, at *1–2 (seeking cell tower data for six different areas, during specified times, where six robberies occurred). In those cases, the government is able to cross-reference the data it receives in order to narrow or cull the initial data dump and identify a handful of cellphone identifiers that appear in all or most of the cell tower dumps. *See id.* at *1 ("Analysis of the cellular information revealed that the same cellphone number was near at least five of the six robbery locations during the time of the robberies."). Based on such narrowing, the government can determine that the remaining identifiers, which appear on cell towers dumps for multiple locations of interest, or at multiple times, likely belong to either the offender or to witnesses.

      The government's application here does not seek such a dump of data from cell towers serving multiple locations, or multiple times, which it then proposes to cross-reference. Instead, the government requests cell tower data for a one-and-a-half hour timeframe, on a single date, and within a close geographic area—the two points and their two connecting city blocks. ECF No. 3 at 5. According to the government, "[a] search of cell tower lists furnished by the Service Providers to the [Federal Bureau of Investigation] identified approximately 337 unique cell sectors within a 0.5 mile square of the locations of interest in this particular investigation." *Id.* at 20. These 337 unique cell sectors presumably serve an area much larger than the limited area of interest. Thus, any data dump from those towers could provide hundreds, if not thousands, of

4

cellphone identifiers, many of which would not belong to either a suspect or witness. The significant scope of the government's request and lack of precision or ability to cross-reference data and narrow the initial data results makes this search different from the type of cell tower dump described above and raises unique probable cause concerns.[4] Put simply, the government has not explained in its application how it proposes to narrow what could be a list of hundreds or thousands of cellphone identifiers, such that there is a fair probability the government will be able to identify the suspect or witnesses. The most the government provides is that the data dump "may be analyzed to identify common cellular numbers utilizing cell towers/sectors consistent with the geographic area and/or locations of interest." *Id.* at 21.[5] More is required than boiler-plate language that merely describes how law enforcement typically uses data from a cell tower dump.[6]

---

[4] At least one other court has considered a cell tower dump application that involved one location, one date, and one timeframe. *See In re Search of Cellular Telephone Towers*, 945 F. Supp. 2d 769, 769 (S.D. Tex. 2013). There, however, the government had evidence that the suspect made a roughly 30-second-long phone call during commission of the crime and therefore requested cell tower data for a four-minute window and also sought data regarding the duration of each call made during that four-minute window. *Id*. at 770. The Court found that such evidence and criteria established probable cause because, although "the [g]overnment may receive hundreds, or even thousands, of telephone numbers," it could "limit the relevant numbers to only about fifteen or twenty individuals.". *Id.* at 771.

[5] In the 1/12/2021 Request, the government explained that "it is *possible* that [the suspect's device] would [have] triangulated in one location, multiple locations, or *possibly none at all*" and that the possible triangulation would be of probative evidentiary value if it occurred. ECF No. 1 at 23. It has since deleted that representation, providing nothing in its place. But even if that language were still in the latest version, it is not clear to the undersigned, when accounting for the margin of error inherent in the triangulation process (a limitation that the government acknowledged in conversations with the undersigned but did not further explain) and considering how close the two points at issue are, that triangulation would have a fair probability of providing useful evidence to the government. And the agent's belief that it is merely "possible" that the cell tower dump requested would gather helpful evidence is unsurprising. The government disclosed in conversations with the undersigned that whether a suspect's phone can successfully be "triangulated" will depend on a range of factors, including whether the suspect carried a phone; if so, whether that phone was turned on; if so, whether and how often the phone communicated with a cell tower during events related to the crime at issue (in the government's parlance, how "leaky" the suspect's phone was); and whether the cell towers at issue are arranged and operating in such a way as to permit accurate triangulation of the phone. The 1/12/2021 Request itself was either silent on these issues or insupportably vague, leaving the Court with an insufficient basis by which to assess the probability that allowing the government access to the requested data would provide evidence in this matter. The 1/13/2021 request is merely silent on these issues, which does not aid in the Court's review.

[6] Notably, the affidavit's reference to identifying common cellular identifiers would be useful only where there are distinct timeframes or areas of interest, as in a conventional cell tower dump request, which is not the case here.

5

Without more, the government's application has not established a fair probability that evidence would be uncovered in the data dump and the undersigned thus cannot authorize the data dump requested here.

In addition to those broader issues with the government's cell tower dump application, the undersigned finds that the following reasons also warrant denial of the application:

- Overall, it is difficult to understand what the government is claiming it can do with the data dump it would receive from the cell towers. In its 1/12/2021 Request, which at least attempted to address "potential law enforcement analysis," the government's explanation of its technical capabilities with respect to the data at issue was not a model of clarity. *See, e.g.*, ECF No. 1 at 21 ¶¶ 20 (stating, "Antenna towers (sometimes referred to as cell sites and here, 'cell towers') come in a variety of shapes and sizes. They also can be located in a variety of places, including but not limited to church steeples, chimneys, water towers, or the sides of buildings," with no explanation as to the relevance of that information) 24 (stating, "A search of cell tower lists furnished by the Service Providers to the FBI identifies approximately 337 unique cell sectors within a 0.5 mile square of the locations of interest in this particular investigation" without further development of how those specific facts impact affect the investigation here), 30–31 (stating, "By analyzing the cell sector information produced by a service provider, FBI personnel expect—based on past experience—that they will be able to more specifically identify the geographic location(s) of cellular devices(s) within the area covered by the service provider" and using as an example that "[i]f . . . a given cellular device is located [at] one or more of the target locations at the times that video evidence shows the [suspect] at those locations, it is *possible* that the given cellular device was utilized by the [suspect]" (emphasis added)). The 1/13/2021 Request entirely omits this discussion. *Compare* ECF No. 1 at 23-24 (discussing potential law enforcement analysis), *with* ECF No. 3 (no discussion of potential law enforcement analysis).

- The government has not provided any information on the size of the area served by the over 300 cell sectors. Is it a .05-mile area? A 50-mile area? Without this information, it is difficult to determine whether the data dump would provide 50 cellphone identifiers or 1,000 cellphone identifiers, which goes both to the extent of the privacy invasion of individuals with cell phones in the area having nothing to do with the crime under investigation and to whether there is a fair probability that the data provided will lead to evidence in the case.

- The government has also not provided information about the area of interest, which would help the undersigned understand how many cellphone identifiers it would

6

- likely receive in a cell tower dump. For example, is it a residential area or a commercial area? Based on video surveillance, is the government able to determine whether it was heavily populated at the relevant time or generally empty? Is there any other reason to believe the cell tower dump would return only a handful of cellphone identifiers of evidentiary value, rather than hundreds?

- The government states that cellular providers "have the ability to determine which cellular tower(s) provided coverage to a given location at a particular time" (ECF No. 3 at 21), but the government does not approximate what a "given location" would encompass. Would that be a few hundred feet or few miles? This explanation would help show whether the government could precisely pinpoint a telephone to the suspect's known location, or if it would only confirm the suspect was in the general vicinity.

- The government suggested in the 1/12/2021 Request that with triangulation, they may be able to track an individual's movement more closely. ECF No. 1 at 23-24. To the extent that is what the government proposes to do, it would implicate significant privacy concerns given the many cellphone identifiers included in the data dump that would have nothing to do with the investigation. This, again, should not be authorized by a court without establishing probable cause that the data dump has a fair probability of providing evidence. *See U.S. v. Jones*, 565 U.S. 400 (concluding that privacy concerns raised by GPS tracking, requiring probable cause showing for search).

## **CONCLUSION**

If the cell dump request were granted in this case, it is difficult to discern when such a warrant would not be granted as most crimes have some physical locus about which the government could assert the possibility of triangulation of cellular data.[7] The government has requested that the Court issue a warrant that would allow it to retrieve anywhere from 0 to 1,000

---

[7] To be sure, geofences, another type of search warrant that rely on cell phone data, can similarly pinpoint an individual's historic location and movement based on GPS data from that person's smartphone. Geofences may also initially provide data of individuals with no nexus to the crime under investigation. But a geofence is far more focused than a cell tower dump—it can essentially be drawn narrowly around the area of interest—and provides truly anonymized data in the initial data dump, rather than cell phone identifiers that can, without little more effort, be associated with individuals. *See e.g. In re Search Warrant App. for Geofence Location Data*, No. 20-m-525, 2020 WL 6343084, *7 (N.D. Ill. Oct. 29, 2020) (probable cause and particularity required by Fourth Amendment established where geofences were limited in location and "narrowly crafted to ensure that location data, with a fair probability, will capture evidence of the crime *only*."). So, a geofence, unlike the cell tower dump at issue here, does not require the disclosure of broad swaths of individuals' phone-specific information that is of no evidentiary value.

cellphone identifiers (or indeed, more) and then proceed, at its discretion, to pursue additional investigative steps regarding any of those devices the government believes would provide evidence or lead to evidence. But the government has not shown that receiving potentially hundreds or thousands of such identifiers, without a means of narrowing those results, has a fair probability of providing evidence, including identification of the suspect or witnesses. Accordingly, the undersigned finds that the government has failed to establish probable cause as required by the Fourth Amendment. Therefore, the government's cell tower dump application is **DENIED**.

      **SO ORDERED.**

Date: January 13, 2021                      _____
                                               G. MICHAEL HARVEY
                                               UNITED STATES MAGISTRATE JUDGE